530 cw

FILED

1 | **PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

2 | Name LOREDO ANTONIO MORALES     NA

JAN 3 1 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

    (Last)       (First)      (Initial)

3 | Prisoner Number T#79622

4 | Institutional Address M.C.S.P. A#4 205 P.O. Box - 409020 IONE CA

5 | 95640 - 409020

6 |

7 | **UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

CRB

8 | MORALES, ANTONIO LOREDO

    )

9 | (Enter the full name of plaintiff in this action.)

CV   **08**    **0753**

    )
Case No. _____

10 |         vs.

    )
(To be provided by the clerk of court)

11 | _____

    )
**PETITION FOR A WRIT**

12 | _____

    )
**OF HABEAS CORPUS**

13 | _____

    )
**(PR)**

E-filing

14 | (Enter the full name of respondent(s) or jailor in this action)

    )

15 |

16 | Read Comments Carefully Before Filling In

17 | When and Where to File

18 |      You should file in the Northern District if you were convicted and sentenced in one of these

19 | counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa,

20 | San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in

21 | this district if you are challenging the manner in which your sentence is being executed, such as loss of

22 | good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

23 |      If you are challenging your conviction or sentence and you were not convicted and sentenced in

24 | one of the above-named fifteen counties, your petition will likely be transferred to the United States

25 | District Court for the district in which the state court that convicted and sentenced you is located. If

26 | you are challenging the execution of your sentence and you are not in prison in one of these counties,

27 | your petition will likely be transferred to the district court for the district that includes the institution

28 | where you are confined. Habeas L.R. 2254-3(b).

PET. FOR WRIT OF HAB. CORPUS      - 1 -

1   Who to Name as Respondent

2         You must name the person in whose actual custody you are.  This usually means the Warden or

3   jailor.  Do not name the State of California, a city, a county or the superior court of the county in which

4   you are imprisoned or by whom you were convicted and sentenced.  These are not proper

5   respondents.

6         If you are not presently in custody pursuant to the state judgment against which you seek relief

7   but may be subject to such custody in the future (e.g., detainers), you must name the person in whose

8   custody you are now and the Attorney General of the state in which the judgment you seek to attack

9   was entered.

10  A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

11        1. What sentence are you challenging in this petition?

12        (a)    Name and location of court that imposed sentence (for example; Alameda
               County Superior Court, Oakland):

13   YOLO COUTY SUPERIOR COURT        725 COURT STREET

14                                    WOODLAND CA 95695

15               Court                      Location

16        (b)    Case number, if known  C047728 / SUPER CT CRF035695

17        (c)    Date and terms of sentence  2/27/06: OPINION

18        (d)    Are you now in custody serving this term?  (Custody means being in jail, on

19               parole or probation, etc.)        Yes _____   No XX

20               Where?

21               Name of Institution:  MORALES ANTONIO L. T#79622

22               Address:  M.C.S.P. A#4 205P.O.BOX 409020 IONE
                          CA 95640 - 409020

23        2. For what crime were you given this sentence?  (If your petition challenges a sentence for

24   more than one crime, list each crime separately using Penal Code numbers if known.  If you are

25   challenging more than one sentence, you should file a different petition for each sentence.)

26   187 (A) §186.22(B)(4) 12022(B)(1) 190.2(A)(22) 667.5(B)

27   _____

28   _____

3. Did you have any of the following?

    Arraignment:                  Yes _____    No **XX**

    Preliminary Hearing:        Yes _____    No **XX**

    Motion to Suppress:        Yes **XX**    No _____

4. How did you plead?

    Guilty _____    Not Guilty **XX**    Nolo Contendere _____

    Any other plea (specify) _____

5. If you went to trial, what kind of trial did you have?

    Jury **XX**    Judge alone _____    Judge alone on a transcript _____

6. Did you testify at your trial?        Yes _____    No **XX**

7. Did you have an attorney at the following proceedings:

    (a)    Arraignment          Yes _____    No **XX**

    (b)    Preliminary hearing      Yes _____    No **XX**

    (c)    Time of plea          Yes _____    No **XX**

    (d)    Trial               Yes **XX**    No _____

    (e)    Sentencing          Yes **XX**    No _____

    (f)    Appeal             Yes **XX**    No _____

    (g)    Other post-conviction proceeding    Yes _____    No **XX**

8. Did you appeal your conviction?        Yes _____    No **XX**

    (a)    If you did, to what court(s) did you appeal?

        Court of Appeal        Yes **XX**    No _____

        Year: _____    Result: _____

        Supreme Court of California    Yes **XX**    No _____

        Year: _____    Result: _____

        Any other court         Yes _____    No **XX**

        Year: **NONE**    Result: **NA** _____

    (b)    If you appealed, were the grounds the same as those that you are raising in this

1   petition?   Yes **XX**   No_____

2   (c)   Was there an opinion?   Yes **XX**   No_____

3   (d)   Did you seek permission to file a late appeal under Rule 31(a)?

4   Yes **XX**   No_____

5   If you did, give the name of the court and the result:
    NONE
6   _____
    NONE
7   _____

8   9.  Other than appeals, have you previously filed any petitions, applications or motions with respect to

9   this conviction in any court, state or federal?   Yes _____   No **XX**

10   [Note:  If you previously filed a petition for a writ of habeas corpus in federal court that

11   challenged the same conviction you are challenging now and if that petition was denied or dismissed

12   with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit

13   for an order authorizing the district court to consider this petition.  You may not file a second or

14   subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit.  28

15   U.S.C. §§ 2244(b).]

16   (a)   If you sought relief in any proceeding other than an appeal, answer the following

17   questions for each proceeding.  Attach extra paper if you need more space.
                                        NONE
18   I.   Name of Court: _____
                                   NONE
19   Type of Proceeding: _____

20   Grounds raised (Be brief but specific):
                          NONE
21   a._____
                     NONE
22   b._____
                     NONE
23   c._____
                     NONE
24   d._____
                                                                    NA
25   Result: _____NONE_____Date of Result:_____
                           NONE
26   II.   Name of Court: _____
                                        NONE
27   Type of Proceeding: _____

28   Grounds raised (Be brief but specific):

1      a. _____ NONE _____

2      b. _____ NONE _____

3      c. _____ NONE _____

4      d. _____ NONE _____

5      Result: _____ NONE _____ Date of Result: NA _____

6    III.    Name of Court: _____ NONE _____

7      Type of Proceeding: NONE _____

8      Grounds raised (Be brief but specific):

9      a. _____ NONE _____

10     b. _____ NONE _____

11     c. _____ NONE _____

12     d. _____ NONE _____

13     Result: _____ NONE _____ Date of Result: NA _____

14   IV.    Name of Court: NONE _____

15     Type of Proceeding: ⁻NONE _____

16     Grounds raised (Be brief but specific): NONE

17     a. _____ NONE _____

18     b. _____ NONE _____

19     c. _____ NONE _____

20     d. _____ NONE _____

21     Result: _____ NONE _____ Date of Result: NA _____

22   (b)    Is any petition, appeal or other post-conviction proceeding now pending in any court?

23                                              Yes _____    No XX _____

24     Name and location of court: NONE _____

25   B. GROUNDS FOR RELIEF

26         State briefly every reason that you believe you are being confined unlawfully.  Give facts to

27   support each claim.  For example, what legal right or privilege were you denied?  What happened?

28   Who made the error?  Avoid legal arguments with numerous case citations.  Attach extra paper if you

PET. FOR WRIT OF HAB. CORPUS          - 5 -

1    need more space. Answer the same questions for each claim.

2    [Note: You must present ALL your claims in your first federal habeas petition. Subsequent

3    petitions may be dismissed without review on the merits. 28 U.S.C. §§ 2244(b); McCleskey v. Zant,

4    499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

5    Claim One:_____          NONE

6    _____    NONE

7    Supporting Facts:_____   NONE

8    _____    NONE

9    _____    NONE

10   _____    NONE

11   Claim Two:_____          NONE

12   _____    NONE

13   Supporting Facts:_____   NONE

14   _____    NONE

15   _____    NONE

16   _____    NONE

17   Claim Three:_____        NONE

18   _____    NONE

19   Supporting Facts:_____   NONE

20   _____    NONE

21   _____    NONE

22   _____    NONE

23   If any of these grounds was not previously presented to any other court, state briefly which

24   grounds were not presented and why:

25   _____    NONE

26   _____    NONE

27   _____    NONE

28   _____    NONE

1        List, by name and citation only, any cases that you think are close factually to yours so that they

2    are an example of the error you believe occurred in your case. Do not discuss the holding or reasoning

3    of these cases:

NONE

4    _____
NONE

5    _____
NONE

6    _____

7    Do you have an attorney for this petition?                          Yes_____     No_XX__

8    If you do, give the name and address of your attorney:
NONE

9    _____

10       WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in

11   this proceeding. I verify under penalty of perjury that the foregoing is true and correct.

12

13   Executed on _1-23-08_                          _Antonio Morales_

14            Date                                     Signature of Petitioner

15

16

17

18

19

20   (Rev. 6/02)

21

22

23

24

25

26

27

28

PET. FOR WRIT OF HAB. CORPUS          - 7 -

California Department Of Corrections
Mule Creek State Prison
Inmate Trust Accounting System
Inmate Trust Account Statement

For the Period of Jul 01, 2007 Thru Jan 02. 2008 :

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THRID APPELLATE DISTRICT

( YOLO )

C047728

( SUPER. CT NO#CRF035695 )

NOT TO BE PUBLISHED

Filed 2/27/06  P. v. Morales CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 977(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 977(b). This opinion has not been certified for publication or ordered published for purposes of rule 977.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>      v.<br><br>ANTONIO LOREDO MORALES et al.,<br><br>      Defendants and Appellants. | C047728<br><br>(Super. Ct. No. CRF035695) |

Jesus Alderete was stabbed to death during a gang-related fight in a Woodland alley in the early morning hours of September 11, 2003.  Woodland police arrested and questioned defendants Antonio Loredo Morales and Juan Carlos Montoya the following day.

The information charged defendants in count 1 with first degree murder (Pen. Code, § 187, subd. (a))[1] with two enhancements that alleged defendants committed the murder for

---

[1] Undesignated statutory references are to the Penal Code.

1

the benefit of a criminal street gang (§ 186.22, subd. (b)(4), the gang enhancement) and personally used a deadly weapon in the commission of the crime (§ 12022, subd. (b)(1), the weapons enhancement). Count 2 charged the defendants with criminal street gang activity (§ 186.22, subd. (a), the substantive gang charge), and count 3 alleged defendants intentionally killed Alderete to further criminal street gang activity (§ 190.2, subd. (a)(22), the gang special circumstance). Count 4 alleged Morales had served a prior prison term. (§ 667.5, subd. (b).)

The jury convicted Montoya of first degree murder and found true the allegations he committed the crime for the benefit of a criminal street gang and personally used a deadly weapon. It also convicted Montoya of participating in a criminal street gang in count 2, and found true the special circumstance that he intentionally killed Alderete to further criminal street gang activity as alleged in count 3.

The court sentenced Montoya to life without the possibility of parole in counts 1 (§ 187) and 3 (§ 190.2, subd. (a)(22), the gang special circumstance) plus a second life term for the section 186.22, subdivision (b)(4) gang enhancement, attached to count 1, which the court stayed pursuant to section 654. The court also imposed determinate terms of one year for the weapon use enhancement as to count 1 and two years for the section 186.22, subdivision (a) substantive gang charge in count 2. Montoya's total sentence was life without the possibility of parole plus three years.

2

The jury found Morales not guilty of first degree murder in count 1, but convicted him of the lesser-included offense of second degree murder. It found the section 186.22, subdivision (b)(4) gang enhancement true and the weapon use enhancement not true. The jury also found Morales guilty of the section 186.22, subdivision (a) substantive gang charge, participating in a criminal street gang, in count 2. As to count 3, the jury found true the section 190.2, subdivision (a)(22) gang special circumstance that Morales intentionally killed Alderete for the benefit of a criminal street gang. However, the court later struck that finding as a matter of law. Morales admitted the prior prison term allegation in count 4.

The court sentenced Morales to 15 years to life for second degree murder in count 1, plus a concurrent term of 15 years to life for the section 186.22, subdivision (b)(4) gang enhancement attached to count 1. The court imposed determinate terms of three years for the section 186.22, subdivision (a) substantive gang charge, participating in a criminal street gang, in count 2, and one year for the prior prison term enhancement in count 4. Morales's total sentence was 15 years to life plus four years.

Montoya and Morales each appeal. Montoya argues: (1) there is insufficient evidence to support a finding of premeditation and deliberation in count 1; (2) there is insufficient evidence to support the gang enhancement, the substantive gang charge and the special circumstance gang finding (§§ 186.22, subds. (a) and (b)(4); 190.2, subd.

3

(a)(22)); (3) the California death penalty law violates the
Eighth Amendment of the United States Constitution; (4) the
court should have stayed the two-year consecutive sentence in
count 2 pursuant to section 654; (5) the court erred in refusing
to instruct with CALJIC No. 4.21 on voluntary intoxication; and
(6) the prosecutor's misconduct violated Montoya's
constitutional rights to due process, confrontation, and a fair
trial.

Morales joins Montoya as to arguments 2, 4, and 6.  He also
contends:  (1) there is insufficient evidence to support the
jury's true finding on the gang enhancement under section
186.22, subdivision (b)(4) because he was not convicted of one
of the enumerated offenses required by that statute; (2) we must
strike the concurrent sentence imposed for the section 186.22,
subdivision (b)(4) enhancement for the same reason; and (3) the
court denied him his rights under *Blakely v. Washington* (2004)
542 U.S. 296 [159 L.Ed.2d 403] when it sentenced him to the
upper term for his conviction in count 2.

As we explain, we shall modify the judgments as to both
defendants by vacating the jury's true findings on the section
186.22, subdivision (b)(4) enhancement, striking the sentences
on that enhancement, and staying the section 186.22, subdivision
(a) sentence imposed in count 2.  We affirm the judgments as
modified.

### FACTUAL AND PROCEDURAL BACKGROUND

Around 11:30 the night of September 10, 2003, Woodland
Police Officer Timothy Keeney stopped Montoya briefly on the

4

northwest corner of Court Street and Fifth Street for riding his bicycle without a light. Montoya told Keeney he was going to the 7-Eleven store. He was acting nervous but consented to a pat search of his clothing. Keeney found no weapons. Montoya's counsel asked on cross-examination whether her client appeared to be "under the influence." Keeney responded that he was not a "drug certified person" and there was no indication in his report that Montoya was under the influence of a controlled substance.

Shortly after midnight, Daniel Rangel heard yelling then screams outside his residence at the corner of North Street and Fifth Street. From his porch, Rangel saw two men from the neighborhood, identified at trial as Montoya and Morales, running north on Fifth Street. Rangel heard Montoya say, "I'm tired of this shit." After Montoya and Morales ran away, Rangel and another resident went to investigate. They found a man lying in a pool of blood in the alley off Fifth Street and called for an ambulance.

Medical personnel arrived and found Jesus Alderete lying face down in a pool of blood with no breath or pulse. Alderete was pronounced dead at the hospital at 12:35 a.m.

Police investigators found no weapons in the alley or in the adjacent yards. They did, however, find a black nylon knife sheath on Fifth Street near the alley. Investigators also discovered shoe prints along the alley fence and blood on the fence all the way to the street.

5

Angelica Roa, Alderete's cousin, went to the crime scene in the early afternoon of September 11, 2003. As she entered the alley, Roa saw two men behind the house where Alderete had lived. One of the men, whom she identified at trial as Montoya, was drinking a beer. Montoya told Roa he was sorry about what happened to Alderete, adding that he "didn't expect something like that to happen around that area." Montoya also indicated that he had known Alderete for a long time and although they were not good friends, "they got along fine." He acknowledged to Roa that he hung around with "the southerners" while Alderete hung out with "the northern." At one point during the conversation, Montoya showed Roa a scar on his back.

Police arrested Montoya on the morning of September 12, 2003, after learning Rangel had seen him running from the scene of the crime. Woodland Police Detective Joshua Simon advised Montoya of his *Miranda* rights.[2] Montoya talked with him for over an hour. The prosecution played a videotape of the interview at trial and the jury received a transcript.

Montoya initially told Simon that he was riding his bicycle home from the 7-Eleven store around 10:00 p.m. on September 10 when a police officer stopped him for not having a light on the bike. He said he went home after that encounter and watched a movie. Montoya acknowledged he knew Alderete by his nickname

---

[2] *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694].

6

"Chongo" but never talked to him.  He knew that Chongo lived on
the alley where he was killed.

Simon told Montoya that someone had seen him running away
from the area where Alderete's body had been found.  According
to Simon, Montoya's demeanor changed.  He crossed his arms and
appeared to be nervous.  In addition, Montoya's hands were
shaking and his breathing was "kind of jagged."  Montoya told
Simon he had been stabbed a year earlier near the hot dog stand
on Fifth Street by a Norteño he did not know.  Montoya
acknowledged he was a Sureño.

When Simon reminded Montoya that he had been seen running
from the scene with another person, Montoya offered a second
version of what happened.  He told Simon that he encountered
Alderete at the entrance to the alley off Fifth Street as he was
riding his bike home from Freeman Park.  Montoya said Alderete
started "talking shit to [him]."  Specifically, Alderete called
Montoya "scrap," a disrespectful term for a Sureño.  According
to Montoya's second story, Alderete started to box with him then
pulled out a knife.  A friend of Montoya's came up and hit
Alderete from behind.  Montoya told Simon he got the knife away
from Alderete and stabbed him with it.  He stated he was not
sure how he got the knife, but said he stabbed Alderete in the
back no more than two or three times.  Referring to Alderete,
Montoya continued, "You know I'm tired of that fool too, you
know.  Always fuckin, fuckin with my mom.  Whatever you know.
Fucking always talking shit."

7

Montoya elaborated on what happened earlier in the evening. He said he was mad at a friend and had gone to a park to fight him. However, Montoya's friend did not want to fight, so he left for home. Montoya told Simon that when Alderete began talking "bullshit" to him, he thought to himself, "I have to bust somebody, you know, so I can go happy." He refused to give Simon the full name of his friend, but eventually identified Morales from a photograph. Montoya also confirmed that Morales hit Alderete with a rock or piece of concrete from the alley and punched Alderete with his fists.

Simon told Montoya he suspected Montoya brought the knife to the fight and suggested the police might find his fingerprints on the knife sheath. At that juncture, Montoya changed his story again. He acknowledged the knife was his and he had been carrying it until the police officer stopped him on his bicycle. Montoya said he threw the knife away toward the alley when he saw the officer making a U-turn to approach him. When Alderete started "talking shit" to Montoya on his way home, he turned around, rode back to pick up the knife, and returned to where Alderete was standing. Alderete swung at Montoya a couple of times, but missed. At that point, Morales came up and hit Alderete from behind. Montoya told Simon that when Alderete moved toward the fence, "I turned back and did it." According to Montoya, he discarded the knife.

During the interview, Detective Simon observed several gang-related tattoos on Montoya's body, including the numbers one and three on the inside of his middle finger, three dots on

8

his elbow, and "Little Sur" on his thigh. A search of Montoya's residence revealed CD's by gang-related artists with covers featuring gang symbols and graffiti. Photos displayed in the residence showed Montoya and the words "Sur 13."

Police arrested Morales in a bedroom of Montoya's residence and brought him to the police station for interrogation on the afternoon of September 12, 2003. Detective Simon read Morales his *Miranda* rights and Morales talked with him. The prosecution played a videotape of the interview at trial and the jury received a copy of the transcript.

Morales told Simon he received a phone call from Montoya late on the night of September 10, 2003. Montoya challenged Morales to a fight because Montoya believed Morales was trying to steal his girlfriend. The two men met at Freeman Park at the south end of Fifth Street where they exchanged words but did not fight. According to Morales, Montoya displayed a knife during the confrontation.

Shortly after Montoya left the park on his bicycle, Morales heard screams. He followed the sounds to the alley off Fifth Street. Morales saw Montoya fighting with a man called "Chongo" whom he knew to be affiliated with the Norteños. Morales told Simon he had previously been in a fist fight with Alderete and heard Alderete call Montoya "scrapa." Morales picked up an object -- described alternatively as a "rock" or "dirt clod" -- and threw it at Alderete's back. Alderete turned to face Morales and began fighting with him. Morales said Montoya started swinging at Alderete's back. Alderete held up his hand

9

and said "sorry" before collapsing to the ground. Morales knew that Montoya "stuck him." Montoya made a motion with the knife and said, "damn homie I stabbed him."

Morales told Simon that he and Montoya fled to Montoya's house. Montoya said he stuck Alderete four times. When he heard police cars driving into the area, Montoya threw the knife over the fence behind his apartment. He also told Morales to throw his pocket knife over the fence.

Morales acknowledged that both he and Montoya were "southerners." However, he explained that he would not get mad if someone called him "scrapa" because he was a "southsider." Before the stabbing, Morales said he told Montoya he did not "play . . . shit" over territory. "I don't play red or blue whatever homie, But ay, don't get me wrong I'm still down for . . . my side homie." Simon testified that Morales had Sureño tattoos on his body, including the word "Sur" on his left hand and three dots on his right hand.

Police investigators found two knives in the vacant lot adjacent to Montoya's apartment. One had a double-edged steel blade and a black plastic handle. The other was a pocket knife. Further analysis revealed Alderete's DNA in blood stains on the knife with the double-edged blade, but none on the pocket knife. There were no fingerprints on either knife.

The autopsy showed that Alderete suffered six stab wounds on his back, two of which caused his death. One fatal wound was four and a half inches deep and the other six inches deep. These stab wounds punctured Alderete's lungs, causing severe

10

bleeding into the chest cavity. The autopsy also revealed an abrasion behind Alderete's right ear which appeared to have been caused by a hard object with well-defined edges, like a brick or piece of concrete. Alderete had a blood-alcohol level of 0.14 percent at the time of his death. He was 5'10" tall and weighed 289 pounds. Alderete had a dot tattooed on the index finger of his right hand and four dots on the fingers of his left hand.

Sergeant Steven Gill, supervisor of the Gang Violence Suppression Unit of the Woodland Police Department, testified as a gang expert. Gill stated that there were approximately 250 Sureños and 400 Norteños in Woodland. He explained that Sureños identify with blue and the number 13, symbolized by tattoos of one and three dots, while Norteños identify with red and the number 14. According to Gill, both gangs "thrive on their theory of respect," gained by instilling fear in rival gang members and the community at large. Gang members do not tolerate disrespect and use violence to increase respect and enhance their gang's reputation. Gill testified that gang members are expected to back each other up in a confrontation with rival gang members.

It was Gill's opinion that both Montoya and Morales were active members of the Sureño criminal street gang on September 11, 2003, based on their clothing, tattoos, prior involvement in gang-related incidents, and their statements to police. Gill testified that Montoya was stabbed in the back in a fight with three Norteños at Fifth and North Streets in June 2002. He also stated that Alderete admitted he was a Norteño as

11

early as 1996. Since that time, Alderete had been observed
flashing gang hand signals and wearing gang symbols and colors.

When asked a hypothetical question based on the
circumstances of this case, Gill stated his opinion that the
stabbing of Alderete was a gang-related incident. According to
Gill, events like the stabbing make citizens reluctant to report
gang activity, help control gang territory and increase drug
sales, and send a message to rival gang members that dire
consequences result from disrespect. Gill testified it was
significant that both Montoya and Morales admitted they were
Sureños, knew Alderete was a Norteño, and recognized Alderete
had disrespected Montoya by calling him "scrapa."

## DISCUSSION

### I

### Sufficiency of the Evidence of Premeditation and Deliberation

Montoya argues there is insufficient evidence he killed
Alderete in the "willful, deliberate, and premeditated" manner
required for conviction of first degree murder. (§§ 187, subd.
(a) & 189.) He maintains that "[r]etrieving the knife appears
to have been in response to the deceased's insults, which would
in the context of the neighborhood and previous encounters with
Norteños, suggest that the deceased was instigating a
fight. . . . Thus, the assault does not appear to be the result
of premeditation, but rather, some type of unplanned
confrontation between [Montoya] and the deceased." The record
does not support Montoya's argument.

12

When a party challenges the sufficiency of the evidence "'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" (*People v. Johnson* (1980) 26 Cal.3d 557, 578, quoting *Jackson v. Virginia* (1979) 443 U.S. 307 [61 L.Ed.2d 560, 573].) Substantial evidence includes circumstantial evidence and the reasonable inferences flowing therefrom. (*In re Michael D.* (2002) 100 Cal.App.4th 115, 126.)

The Supreme Court explained what the prosecution must prove to establish the "premeditation" and "deliberation" required to support a verdict of first degree murder. "A verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill. . . . 'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance. [Citations.] 'The process of premeditation and deliberation does not require any extended period of time. "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly. . . ." [Citations.]' [Citation.]" (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080.)

"Generally, there are three categories of evidence sufficient to sustain a premeditated and deliberate murder: evidence of planning, motive, and method. [Citations.] When evidence of all three categories is not present, 'we require

13

either very strong evidence of planning, or some evidence of
motive in conjunction with planning or a deliberate manner of
killing.' [Citation.] But these categories of evidence,
borrowed from *People v. Anderson* (1968) 70 Cal.2d 15, 26-27
. . . 'are descriptive, not normative.' [Citation.] They are
simply an 'aid [for] reviewing courts in assessing whether the
evidence is supportive of an inference that the killing was the
result of preexisting reflection and weighing of considerations
rather than mere unconsidered or rash impulse.' [Citation.]"
(*People v. Cole* (2004) 33 Cal.4th 1158, 1224.)

The record in this case reveals evidence in all three
categories. As to evidence of planning, during his interview
with Detective Simon, Montoya stated that after Alderete began
"talking shit" to him, he retrieved the knife from where he had
discarded it earlier. When Alderete started calling him names,
Montoya thought to himself: "I have to bust somebody . . . so I
can go happy." After Montoya returned with the knife, Morales
hit Alderete in the back of the head with a rock and started to
fight with him. Only then, when Alderete's back was turned, did
Montoya administer the multiple blows including the two fatal
blows with his knife. A reasonable jury could conclude Montoya
had ample time to plan his actions and to await the opportunity
to attack when Alderete was vulnerable, between the time
Alderete began insulting him and the time he stabbed Alderete.

The evidence also revealed Montoya had a motive to kill
Alderete. There is undisputed evidence that Montoya and
Alderete were members of rival gangs. Montoya told Simon that

14

he was tired of Alderete "always talking shit" and "fuckin with [his] mom." Sergeant Gill testified that insults between rival gang members often escalated into violence because gangs do not tolerate disrespect and use violence to increase respect and enhance their gang's reputation. Both Montoya and Morales heard Alderete call Montoya a "scrap," a putative derogatory term for a Sureño, before the physical confrontation. There was also evidence that Alderete was the Norteño who stabbed Montoya in June 2002 near the hot dog stand on Fifth Street. A reasonable jury could infer Montoya killed Alderete to uphold the general reputation of the Sureños or to retaliate against this particular Norteño for the insults and earlier assault.

In light of all the circumstances, the evidence was sufficient to show that Montoya's method was consistent with a premeditated killing. With two men against one, Morales distracted Alderete by hitting him in the head with a rock. Montoya waited until Alderete turned to face Morales before stabbing him six times in the back with enough force to cause not one but two fatal wounds, a six-inch wound and a four and one-half inch wound. The record amply supports Montoya's conviction of first degree murder.

II

## Sufficiency of the Evidence of Gang-Related Activity

Montoya also contends there is insufficient evidence to support the true finding of the gang enhancement in count 1 (§ 186.22, subd. (b)(4)), his conviction of criminal street gang

15

activity in count 2 (§ 186.22, subd. (a)), and the true finding on the special circumstance alleged in count 3 (§ 190.2, subd. (a)(22)). Morales joins in Montoya's argument as to the gang enhancement finding in count 1 and gang activity conviction in count 2. He also challenges the count 1 gang enhancement on a different ground and Montoya joins in that challenge. We conclude the record supports the jury verdicts as to counts 2 and 3, but not the gang enhancement in count 1.

## A. *The Section 186.22, Subdivision (b)(4) Enhancement:*

The information charged and the jury found true the allegation that defendants were subject to a gang enhancement for criminal street gang activity within the meaning of section 186.22, subdivision (b)(4). Defendants argue we must vacate the special findings and strike the sentences imposed for the gang enhancement because the underlying crime was murder, not one of the specific crimes enumerated in section 186.22, subdivision (b)(4). We agree with defendants' analysis.

Section 186.22, subdivision (b)(4) provides:

"Any person who is convicted of a felony *enumerated in this paragraph* committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, shall, upon conviction of that felony, be sentenced to an indeterminate term of life imprisonment with a minimum term of the indeterminate sentence calculated as the greater of:

16

"(A) The term determined by the court pursuant to Section 1170 for the underlying conviction, including any enhancement applicable under Chapter 4.5 (commencing with Section 1170) of Title 7 of Part 2, or any period prescribed by Section 3046, if the felony is *any of the offenses enumerated in subparagraph (B) or (C) of this paragraph.*

"(B) Imprisonment in the state prison for 15 years, if the felony is a *home invasion robbery*, . . . *carjacking*, . . . a felony violation of Section 246; or a violation of Section 12022.55.

"(C) Imprisonment in the state prison for seven years, if the felony is *extortion*, . . . or *threats to victims and witnesses*, . . . ." (Italics added.)

Thus, under the plain meaning of section 186.22, subdivision (b)(4), in order for the jury to find the gang enhancement true, it would have to have convicted defendants of the underlying offense of home invasion robbery, carjacking, extortion or witness intimidation. (See *People v. Johnson* (2003) 109 Cal.App.4th 1230, 1237, fn. 2.)

The same standard of review applies to challenges to convictions and gang enhancements. (*People v. Vy* (2004) 122 Cal.App.4th 1209, 1224.) We review "'the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence--that is, evidence which is reasonable, credible, and of solid value--such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.'" (*Ibid.*, quoting *People v. Johnson*, *supra*,

17

26 Cal.3d at p. 578.)  Here, there is no evidence defendants

were convicted of any of the underlying crimes enumerated in

section 186.22, subdivision (b)(4).

The Attorney General's response misses the mark.  Without

referring to the statutory language requiring conviction of home

invasion robbery, carjacking, extortion or witness intimidation,

he states:  "The instructions on the gang enhancement alleged

pursuant to section 186.22, subdivision (b)(4), asked the jury

to find that the murder alleged in count one was committed 'for

the benefit of, at the direction of, or in association with a

criminal street gang' and 'with the specific intent to promote,

further, or assist in any criminal conduct by gang members.'"

As we explain below, there is sufficient evidence to support

those general findings regarding gang activity.  However, there

is *no* evidence to support a finding that the prosecution

satisfied the specific requirements of the section 186.22,

subdivision (b)(4) enhancement.

Based on the foregoing, we vacate the jury's true findings

on the gang enhancement and therefore strike defendants'

sentences on the section 186.22, subdivision (b)(4) enhancement.

18

## B. *The Section 186.22, Subdivision (a) Substantive Gang Charge*:

Defendants contend there is insufficient evidence to support their conviction of violating section 186.22, subdivision (a) in count 2.[3]

Section 186.22, subdivision (a) provides: "Any person who actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang, shall be punished by imprisonment in a county jail for a period not to exceed one year, or by imprisonment in the state prison for 16 months, or two or three years."

Section 186.22, subdivision (e) defines "pattern of criminal gang activity" as "the commission of . . . or conviction of two or more of the following offenses, provided at least one of these offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons:

---

[3] We reject the Attorney General's claim the defendants failed to address their challenge to the substantive gang activity count in the body of their brief. The existence of a criminal street gang is an element of both the substantive offense and enhancements under section 186.22. (*In re Jose P.* (2003) 106 Cal.App.4th 458, 466 (*Jose P.*)) References in Montoya's opening brief make clear his argument applied to section 186.22, subdivision (a) as well as the enhancements.

19

[¶] (1) Assault with a deadly weapon or by means of force
likely to produce great bodily injury, as defined in Section
245."

Section 186.22, subdivision (f) defines "criminal street
gang" as "any ongoing organization, association, or group of
three or more persons, whether formal or informal, having as one
of its primary activities the commission of one or more of the
criminal acts enumerated in paragraphs (1) to (25), inclusive,
of subdivision (e), having a common name or common identifying
sign or symbol, and whose members individually or collectively
engage in or have engaged in a pattern of criminal gang
activity."

Thus, in order to convict defendants of criminal gang
activity, the prosecution was required to prove "that the gang
(1) is an ongoing association of three or more persons with a
common name or common identifying sign or symbol; (2) has as one
of its primary activities the commission of one or more of the
criminal acts enumerated in the statute; and (3) includes
members who either individually or collectively have engaged in
a 'pattern of criminal gang activity' by committing, attempting
to commit, or soliciting two or more of the enumerated offenses
(the so-called 'predicate offenses') during the statutorily
defined period. (§ 186.22, subds. (e) & (f).)" (*People v.
Gardeley* (1996) 14 Cal.4th 605, 617 (*Gardeley*), italics
omitted.)

At trial, Sergeant Gill, supervisor of the Gang Suppression
Unit of the Woodland Police Department, testified about the

20

predicate offenses. He stated that in November 2002, two Sureño gang members named Angel Morales and Oscar Velasco attacked a Norteño who was walking through Sureño territory in Woodland displaying a red bandana.[4] The two Sureños took that action as disrespect. Angel Morales stabbed the Norteño in the head. He was charged with and convicted of assault with a deadly weapon and a gang enhancement. Velasco punched and kicked the Norteño. He was convicted of assault likely to produce great bodily injury and a gang enhancement. Sergeant Gill testified that in his opinion both Velasco and Angel Morales were active participants in a criminal street gang when they committed the assault.

Relying on *People v. Valdez* (1997) 58 Cal.App.4th 494 (*Valdez*), defendants claim "[t]here was no evidence that either of the predicate crime perpetrators had any connection to the Sureño subset of which [defendants were members], or that there was any connection between the two predicate perpetrators and [defendants] other than the general Sureño designation."

Defendants' reliance on *Valdez* is misplaced. In that case, a group of individuals from several different Norteño "cliques or gangs" in San Jose came together to form a "caravan" to attack Sureños. (*Valdez*, *supra*, 58 Cal.App.4th at pp. 503-504.) On appeal, the defendant argued the trial court abused its discretion in allowing the gang expert to testify in detail on

---

[4] There was no claim that Angel Morales was related to defendant Antonio Loredo Morales.

21

whether defendant acted for the benefit of a gang, an ultimate factual issue for the jury. (Id. at p. 507.) Ruling that the trial court did not abuse its discretion under the "not so simple" facts of that particular case, the Court of Appeal, Sixth Appellate District explained: "The participants in the caravan were a diverse group, with affiliations to different gangs. They united for one day to attack Sure[ñ]os. At the time it assembled, the caravan was not a 'criminal street gang' within the meaning of the enhancement allegation. Moreover, their common identification as Norteños did not establish them as a street gang, for, as [the expert] testified, Norteño and Sure[ñ]o are not the names of gangs. Finally, without further evidence, the mere fact that a group of Norteños spent the day attacking Sure[ñ]os does not prove conduct for the benefit of some unidentified street gang." (Id. at p. 508.) In a subsequent case, Jose P., the Sixth Appellate District made clear that Valdez was limited to its facts and "does not hold that there is no criminal street gang called Norteño." (Jose P., supra, 106 Cal.App.4th at p. 467.) In this case, there is no evidence defendants were members of a subset of Sureños. Sergeant Gill's testimony and the supporting documents provided sufficient evidence that Angel Morales and Oscar Velasco committed the predicate offenses as members of the same criminal gang to which defendants belonged.

Defendants also contend Gill's testimony "that the offenses were gang related is mere speculation on his part." They insist "there was no evidence that the conflict was anymore than

22

[Montoya's] looking for a fight, whether it was with his friend, co-appellant Morales, a Sureño, or the deceased, a Norteño."

We disagree. Evidence adduced at trial showed that the alley where Alderete was killed, as well as the neighborhood surrounding it, was Sureño territory. Defendants, both Sureños, knew Alderete was a Norteño. Montoya and Morales heard Alderete call Montoya "scrap" or "scrapa," a derogatory term for Sureño, just before the fight broke out. Taking this evidence into consideration, Sergeant Gill testified that gang members often react to verbal insults with violence because they do not tolerate disrespect and want to instill fear in rival gang members. He responded to a hypothetical question based on the facts of this case by stating his opinion that the killing was a gang-related incident.

Contrary to defendants' contentions, Sergeant Gill's testimony was not "mere speculation," but proper expert opinion. Under Evidence Code section 801, subdivision (a), "expert opinion testimony is admissible only if the subject matter of the testimony is 'sufficiently beyond common experience that the opinion of an expert would assist the trier of fact.'" (*Gardeley, supra,* 14 Cal.4th at p. 617.) Testimony about the culture and habits of criminal street gangs satisfies the Evidence Code requirement. (*Ibid.*) Such expert opinion may include testimony that the crimes were committed with the specific intent to promote, further, or assist in the gang's criminal activities. (See *In re Ramon T.* (1997) 57 Cal.App.4th 201, 207-208.)

23

## C. *The Section 190.2, Subdivision (a)(22) Gang Special Circumstance:*

Section 190.2, subdivision (a)(22) reads: "The penalty for a defendant who is found guilty of murder in the first degree is death or imprisonment in the state prison for life without the possibility of parole if one or more of the following special circumstances has been found under Section 190.4 to be true: [¶] . . . [¶] (22) The defendant intentionally killed the victim while the defendant was an active participant in a criminal street gang, as defined in subdivision (f) of Section 186.22, and the murder was carried out to further the activities of the criminal street gang."

Montoya asserts the prosecution failed to prove he had the specific intent to participate in criminal gang conduct or that he stabbed Alderete to promote the gang's criminal enterprises. We conclude the evidence described in the foregoing section, including Sergeant Gill's expert testimony, also supports the jury's true finding as to Montoya in count 3.

### III

### Refusal To Instruct on Voluntary Intoxication

Morales testified at trial that Montoya was angry when he met Morales at Freeman Park to fight over Montoya's girlfriend. According to Morales, Montoya looked like he had been up for a couple of days and was under the influence of methamphetamine. Morales told Montoya that Montoya was "'trippin'" and people would think he was "crazy on drugs" if he fought with Morales.

24

On appeal, Montoya argues the trial court erred in refusing to instruct the jury on voluntary intoxication in accordance with CALJIC No. 4.21.[5] He stresses that he was entitled to an instruction on this theory of defense. We conclude there was no error and, in any event, any error would be harmless.

CALJIC No. 4.21 reads in part: "If the evidence shows that the defendant was intoxicated at the time of the alleged crime, you should consider that fact in deciding whether defendant had the required [specific intent][mental state[s]]. [¶] If from all the evidence you have a reasonable doubt whether the defendant formed that [specific intent][mental state[s]], you must find that [he][she] did not have such [specific intent][mental state[s]]."

A defendant is entitled to an instruction on voluntary intoxication as a defense to a specific intent crime "only when there is substantial evidence of the defendant's voluntary intoxication and the intoxication affected the defendant's 'actual formation of specific intent.'" (*People v. Williams* (1997) 16 Cal.4th 635, 677.) We agree with the trial court that there was insufficient evidence of voluntary intoxication upon which to give the instruction.

Notwithstanding what Morales had to say about Montoya's condition at the park, there is overwhelming evidence that

---

[5] The parties agree that although the record indicates Montoya's defense counsel argued in support of her request for CALJIC No. 4.20, the context of the discussion shows she was referring to CALJIC No. 4.21.

25

Montoya was in full command of his faculties during the period
before and after he murdered Alderete. Montoya had a knife with
him when he was riding his bike but threw it away when Officer
Keeney turned to approach him. Keeney did not notice that
Montoya was under the influence. When Alderete started
insulting him, Montoya not only remembered where he had thrown
the knife but was able to recover it. He attacked with the
knife when Alderete turned to face Morales. Montoya moved in
and knifed Alderete in the back when Alderete was the most
vulnerable. Montoya told Morales that night, immediately after
the stabbing, "damn homie I stabbed him." As Montoya and
Morales fled, Montoya said, "I'm tired of this shit." Montoya
also knew he had stabbed Alderete multiple times when he told
Morales he stuck Alderete four times. Once the pair reached
Montoya's apartment, Montoya threw his knife over the fence and
insisted that Morales throw away his pocket knife as well.
Significantly, Montoya was able to remember, fabricate, and
ultimately recount the events in order and in detail to
Detective Simon the following day.

However, even if the court erred in refusing to instruct
with CALJIC No. 4.21, the error was harmless. The *Watson*[6]
standard applies because a successful defense of voluntary
intoxication would have lessened the degree of homicide, not
provided a complete defense to murder. (See *People v. Breverman*

---

[6] *People v. Watson* (1956) 46 Cal.2d 818, 836.

(1998) 19 Cal.4th 142, 172-173 [*Watson* standard appropriate
where defendant claims the trial court failed to instruct on all
lesser included offenses supported by the evidence].) As we
explained, even if the jury believed Morales's description of
Montoya's condition at the park, there was no evidence Montoya
was unable to think straight, or -- more important in this
context -- form the intent to kill. Thus, we conclude it is not
reasonably probable the jury would have found Montoya not guilty
of first degree murder if it had been instructed with CALJIC
No. 4.21.

## IV

### Prosecutorial Misconduct

Morales's sister Valeria Morales testified about a
confrontation between Morales and three men, including Alderete,
a few months before Alderete was killed. Valeria talked her
brother into leaving the scene. She also testified that the hot
dog vendor told her that Alderete was the man who stabbed
Montoya in 2002.

On cross-examination, the prosecutor started to ask Valeria
Morales about a misdemeanor conviction. Morales's counsel
objected that the prosecutor "was not going to be allowed to go
into this . . . ." Defense counsel also complained that the
prosecutor had placed seven or eight files on the "edge of the
table closest to the jury" and thumbed through them as he
started to question Valeria about her record. The court ruled
the fact of that conviction admissible to impeach Valeria's
credibility. However, the court agreed with counsel that the

27

prosecutor's conduct was improper, stating: "You don't want to create any misimpression with the jury that this or any witness may have a lengthy criminal record by showing a jury a number of files. . . ." Montoya's defense counsel moved for a mistrial. The court responded, "I don't think it rises to that level. So I am going to deny your motion."

On appeal, Montoya and Morales argue that the prosecutor's misconduct violated their constitutional rights to due process, confrontation and a fair trial. They contend they were prejudiced because Valeria Morales's "testimony supported the imperfect self-defense aspect of the defense case, inasmuch as both [defendants] would be expected to act more harshly when confronted by the deceased." We agree with the trial court that although the prosecutor's conduct was improper, it did not rise to the level of prosecutorial misconduct and require the court to declare a mistrial.

" 'The applicable federal and state standards regarding prosecutorial misconduct are well established. " 'A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process."' " [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves " '"the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury."' " [Citation.]' [Citation.]" (*People v. Hill* (1998) 17 Cal.4th

800, 819 (*Hill*).) The challenged conduct need not be intentional to warrant relief. (*People v. Bolton* (1979) 23 Cal.3d 208, 213-214.) Instead, misconduct is judged by an objective standard and the prosecutor's "'"good faith *vel non*" is not "crucial."'" (*People v. Alvarez* (1996) 14 Cal.4th 155, 213.) It is misconduct for a prosecutor to ask a witness a question that implies a fact harmful to a defendant unless the prosecutor has reasonable grounds to anticipate an answer confirming the implied fact or is prepared to prove the fact by other means. (*People v. Warren* (1988) 45 Cal.3d 471, 480.)

In this case, the prosecutor had reason to expect Valeria Morales to confirm that she had been convicted of making a criminal threat. Although the prosecutor first asked Valeria whether she had been in court before for her "own cases," the discussion that followed the defense objection focused on the single misdemeanor. There is no indication the jury noticed the files on the table between the time the prosecutor asked Valeria whether she had been in court before and the time the court sent the jury to lunch -- less than half a page in the reporter's transcript. The prosecutor's single act of thumbing through a stack of case files did not constitute an egregious pattern of misconduct that violated defendants' constitutional rights. (*Hill, supra,* 17 Cal.4th at p. 819.)

29

**V**

## Sentencing on Count 2, the Section 186.22, Subdivision (a) Substantive Gang Charge

### A. *Section 654:*

The Attorney General properly concedes the court erred in failing to stay the sentences imposed on Montoya and Morales in count 2 for engaging in criminal street gang activity in violation of section 186.22, subdivision (a).

Section 654, subdivision (a), reads in relevant part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."

The statute bars multiple punishments for a single act or indivisible course of conduct. (*People v. Miller* (1977) 18 Cal.3d 873, 885.) "Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." (*People v. Neal* (1960) 55 Cal.2d 11, 19.)

Section 186.22, subdivision (a) "is a substantive offense whose gravamen is the *participation in the gang itself.*" (*People v. Herrera* (1999) 70 Cal.App.4th 1456, 1467, fn. omitted.) A defendant's violation of the substantive gang

30

offense may involve a separate objective from the underlying felony committed on behalf of the gang.  In that circumstance, section 654 is no bar to punishment for both offenses.  (*Id.* at p. 1468.)

However, in this case the jury verdicts and special findings show that defendants' intent and objective in committing counts 1 and 2 were the same.  There is no evidence to suggest the contrary.  We therefore modify the judgment to stay the sentences imposed on Montoya and Morales in count 2 pursuant to section 654.

## B.  *Blakeley*:

Morales challenges imposition of the upper term of three years for his conviction of violating section 186.22, subdivision (a) in count 2.  He acknowledges that this court must uphold the sentence based on the California Supreme Court's recent decision in *People v. Black* (2005) 35 Cal.4th 1238, but seeks to preserve his constitutional claim for "further review."

## VI

## The California Death Penalty Law Is Constitutional

As we explained, the jury found Montoya guilty of first degree murder and found true the gang special circumstance under section 190.2, subdivision (a)(22) in count 3.  Although not sentenced to death, Montoya argues that California's death penalty law "is unconstitutional under the United States and California Constitutions because it fails to narrow the class of death-eligible murderers and thus renders the overwhelming majority of intentional first degree murderers death eligible."

31

Montoya recognizes that California courts have consistently rejected this claim, but "submits that the March 7, 2000, passage of Proposition 21, amending section 190.2, subdivision (a), with subsection (22), as applied in this case, reopens this argument and compels reversal of the street gang special circumstance."  We reject Montoya's argument.

Montoya has standing to raise this constitutional claim (*People v. Estrada* (1995) 11 Cal.4th 568, 575-576), but offers no factual or legal support for his claim the death penalty law no longer narrows the class of death eligible persons.

## DISPOSITION

The judgments are modified to vacate the findings as to the gang enhancement under section 186.22, subdivision (b)(4), strike the sentences imposed for that gang enhancement, and stay the sentences in count 2 pertaining to the substantive gang charge, section 186.22, subdivision (a).  As modified, the judgments are affirmed.

_____ CANTIL-SAKAUYE _____ , J.

We concur:

_____ SCOTLAND _____ , P.J.

_____ MORRISON _____ , J.

32

PROOF OF SREVICE BY MAIL

# DECLARATION OF SERVICE BY MAIL

CASE NAME:_____ CASE NO:_____

I, **MORALES ANTONIO LOREDO**_____, am a resident of the state of California Mule
Creek State Prison ( M. C. S. P ) at Ione, County of Amador, California, and am at least 18 years
of age, and am party to the within action. My mailing address is P.O. Box 409000, Ione, California
95640-9000.

On_____, I served a true and correct copy of the following document(s);

**UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF CALIFORNIA**
**450 GOLDEN GATE AVE BOX 36060**
**SAN FRANCISCO CA 94102**
**PETITION FOR WRIT OF HABEAS CORPUS**

On each party listed below by placing it in a sealed envelope, with adequate postage or provided,
and depositing said envelope in the institutional mail box or turned said envelope to custodial
personnel for the United States Mail at Mule Creek State Prison, P.O. Box 409000, Ione,
California 956490900. Each party to the action has been duly served.

This copy is being mailed to:
**NORTERN DISTRICT OF CALIFORNIA**
**450 GOLDEN GATE AVE BOX - 36060**
**SAN FRANCISCO CA 94102**

I have mailed additional copies to:                **NONE**

There is regular service by the United States Mail between the above place of mailing and the
parties listed.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed this date:_____, 20____, at Ione, California.

Signed: _Antonio morales_____ ,CDC No: _T-79672_____

## M. C. S. P MAILROOM ACKNOWLEDGEMENT OF MAILING

DATE: _1 - 23 - 08_ SIGNED: _Antone morales_____

MORALES ANTONIO LOREDO T#79622
M.C.S.P.A#4 205 P.O. Box - 409020
IONE CA 95640 - 409020

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MORALES, ANTONIO LOREDO    )
     PLAINTIFF,    )
    )
    )
V.    )
    )
WARDEN _____    )
    DEFENDANT    )
_____)

PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

UNITED STATES DISTRICT COURT
OF CALIFORNIA
450 GOLDEN GATE AVE BOX 36060
SAN FRANCISCO CA 94102

USA FIRST-CLASS FOREVER

$01.51

MAILED FROM ZIP CODE 95964

JAN 2 8 2008

Ronales Antonio Lonedo TJ79622
M.C.S.P. HH - 205 P.O. Box - 409020
Jone CCA 95640    409020

RECEIVED

JAN 2 8 2008

RICHARD W. WIEKING
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

United States District Court Northern
of California
450 Golden Gate Ave Box 36060



" Legal - Mail "